SHEPHERD, Circuit Judge,
with whom WOLLMAN and LOKEN, Circuit Judges, join, dissenting, and with whom KELLY, Circuit Judge, joins Parts I.B and II of the dissent.
Today’s opinion incorrectly interprets Supreme Court precedent, fails to hold the plaintiffs’ complaint to the plausibility standard of Twombly and Iqbal, and ignores the purposes of the antitrust statute of limitations. For these reasons, I respectfully dissent.
I.
First, the opinion interprets the antitrust discussion in Klehr completely divorced from the facts and issues confronting the Supreme Court in that ease. As a result, the majority fails to apply antitrust law correctly to the case before us. Had the majority considered Klehr in context, it would have found that plaintiffs must show a live, ongoing conspiracy within the limitations period to survive a motion to dismiss.
A.
Klehr v. A.O. Smith Corp. was a RICO case that rejected the Third Circuit’s “last predicate rule” for tolling claims brought under that statute. 521 U.S. 179, 187, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997). Because “Congress consciously patterned civil RICO after the Clayton Act,” the Supreme Court employed a “Clayton Act analogy” to explain why the Third Circuit had erred. Id. at 189, 117 S.Ct. 1984 (em *1072 phasis added). In its attempt to explain the tolling requirements of RICO, the Court offered the following restatement of antitrust law:
Antitrust law provides that, in the case of a “continuing violation,” say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, “each overt act that is part of the violation and that injures the plaintiff,” e.g., each sale to the plaintiff, “starts the statutory period running again....”
Id. (emphasis added) (quoting 2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 338b, at 145 (rev. ed. 1995)).
Klehr was a RICO case, not an antitrust case. The parties in Klehr litigated RICO issues, not antitrust issues. The Supreme Court’s short discussion of antitrust law served only to illuminate the discussion of tolling RICO claims.[3] The Court was neither announcing some new standard in antitrust law nor redefining a continuing violation. It simply used established principles of antitrust law to “help ... make[ ] clear” the RICO issue. Id.
With the excerpted language from Klehr in its proper context, we can better understand the antitrust principles it espouses. For its analogy, the Supreme Court turned to the leading treatise on the subject—Areeda and Hovenkamp’s Antitrust Law. The original quote from Areeda reads, “In the case of a continuing violation, each overt act that is part of the violation and that injures the plaintiff starts the statutory period running again.” 2 Areeda & Hovenkamp, supra, at 145. Areeda says nothing about “each sale to the plaintiff” constituting an overt act at this point. But Areeda does reach the issue just a few sentences later where it explains that, “so long as an illegal price-fixing conspiracy was alive, each sale at the fixed price [started the four-year statute of limitation anew].” Id. (emphasis added) (citing Hanover Shoe v. United Shoe Mach. Corp., 392 U.S. 481, 502 n.15, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968)). Therefore each sale to the plaintiff can start the statutory period running again so long as an illegal price-fixing conspiracy is alive and ongoing.
B.
Klehr is fully consonant with this interpretation. The antitrust analogy presumes that “a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years” continues to exist. Klehr, 521 U.S. at 189, 117 S.Ct. 1984. Further, the excerpted language states that “each sale to the plaintiff’ must be “part of the violation.” Id. (internal quotation marks omitted). So the plaintiffs must show that the sales occurred as a result of a live, ongoing conspiracy. See Midwestern Mach. Co. v. Nw. Airlines, Inc., 392 F.3d 265, 269 (8th Cir. 2004) (“The typical antitrust continuing violation occurs in a price-fixing conspiracy ... when conspirators continue to meet to fine-tune their cartel agreement.”). This interpretation in no way “limit[s] Supreme Court opinions precisely to the facts of each case.” See Jones v. St. Paul Cos., 495 F.3d 888, 893 (8th Cir. 2007) (internal quotation marks omitted). Instead, it gives *1073 meaning to an isolated excerpt by considering the broader factual context from which the excerpt came.
The other two Supreme Court cases cited in the majority opinion—Hanover Shoe and Zenith Radio—also support the proposition that plaintiffs must make a plausible showing of a live, ongoing conspiracy. In Hanover Shoe, Hanover alleged “that United’s practice of leasing and refusing to sell its more complicated and important shoe machinery” violated antitrust law. 392 U.S. at 483, 88 S.Ct. 2224. In its defense, United argued that “because the earliest impact on Hanover of United’s lease only policy occurred in 1912, Hanover’s cause of action arose during that year and is now barred by the ... statute of limitations.” Id. at 502 n.15, 88 S.Ct. 2224. The Court rejected this argument because United’s conduct was a continuing violation. Id. Importantly, the underlying conspiratorial activity (United’s lease-only policy) was ongoing from 1912 through 1955. Id. This continued conspiratorial activity is what rendered each lease—and refusal to sell— an overt act that restarted the limitations period. See 2 Areeda & Hovenkamp, supra, at 145. Just as with Hanover Shoe, so too with Zenith Radio. Zenith sued Hazel-tine Research over Hazeltine’s “participation in patent pools” that violated the Sherman Act. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 323, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). Zenith sought to recover damages suffered during the limitations period, even though Hazel-tine entered the patent pools long before the limitations period. Id. at 338, 91 S.Ct. 795. The Court held that Zenith could recover damages, noting that Hazeltine was engaging in a “continuing conspiracy to violate the antitrust laws,” and so each act harmful to Zenith restarted the limitations period. Id. (emphasis added). In Klehr, Hanover Shoe, and Zenith Radio, the Supreme Court understood that a necessary requirement for a continuing violation of antitrust laws is the existence of a live, ongoing conspiracy. Without such a requirement, plaintiffs could sue many years after an antitrust violation occurred and seek damages for subsequent sales without tying the prior antitrust violation to the subsequent sales.
II.
Accordingly, the plaintiffs must sufficiently allege that the defendants engaged in a live, ongoing conspiracy sometime in the limitations period to survive a motion to dismiss. The plaintiffs can accomplish this task by alleging “sufficient factual matter, accepted as true, to ‘state a claim to relief that is plausible on its face.’ ” Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The plausibility standard demands “factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.” H. (citing Twombly, 550 U.S. at 556, 127 S.Ct. 1955). The plaintiffs have failed to make a plausible claim if all they offer are “labels and conclusions,” “a formulaic recitation of the elements of a cause of action,” or “naked assertion[s]” devoid of “further factual enhancement.” Twombly, 550 U.S. at 555-57, 127 S.Ct. 1955.
In determining whether the plaintiffs have pled a plausible cause of action, the majority relies heavily on paragraph 111 of the amended complaint:
Plaintiffs purchased Filled Propane Exchange Tanks from Blue Rhino or Am-eriGas on multiple occasions during the Class Period. On each occasion, Plaintiffs purchased Filled Propane Exchange Tanks containing only 15 pounds of propane, pursuant to the conspiracy, but sold at the price they would have been charged for 17-pound tanks but for the conspiracy. As Defendants kept *1074 prices constant despite the fill level reduction, this amounted to an effective price increase of 13%.
Amended Complaint ¶ 111, ECF No. 102. The majority takes these assertions, together with paragraphs 7 through 9, which allege facts occurring in 2008, and holds that the plaintiffs have “sufficiently alleged] a price-fixing conspiracy.”
The majority’s holding flies in the face of Twombly and Iqbal. Paragraph 111 is, at best, a “formulaic recitation of the elements of a cause of action” insufficient under the plausibility standard. See Twombly, 550 U.S. at 555, 127 S.Ct. 1955. And paragraphs 7 through 9 deal only with facts, from 2008, well outside the limitations period. The majority opinion fails to discuss one factual allegation from within the limitations period in concluding that the plaintiffs have sufficiently alleged a conspiracy. This is perhaps not surprising, since virtually all of the amended complaint comprises either factual allegations from before the limitations period or naked assertions and conclusions.[4]
At oral argument, plaintiffs’ counsel essentially conceded that the plaintiffs lack any factual allegations of a live, ongoing conspiracy during the limitations period. In response to a question asking whether there have been any overt acts to maintain the conspiracy during the limitations period, counsel could only identify paragraph 92 of the complaint. But paragraph 92 simply makes naked assertions —devoid of factual enhancements—that the defendants “regularly communicated” and “monitored the market” to ensure compliance. Pressed further about whether plaintiffs had alleged an ongoing price-fixing conspiracy, plaintiffs’ counsel directed the court to paragraph 111—a mere recitation of the elements of the cause of action.
After a thorough review of the amended complaint, I find no plausible allegation of a live, ongoing conspiracy occurring within the limitations period. Indeed, the only factual allegations within the limitations period concern the fill levels of the propane tanks. Taking the factual allegations as true, the defendants conspired in 2008 to reduce the fill levels from 17 to 15 pounds.[5] The fill levels for propane tanks sold by all defendants remain at 15 pounds today. But allegations that fill levels remain at the same levels cannot suffice. Showing parallel conduct, without more, “falls short of conclusively establish[ing] agreement or ... itself constituting] a Sherman Act offense.” Id. at 553, 127 S.Ct. 1955 (alterations in original) (internal quotation marks omitted). “Even conscious *1075 parallelism, a common reaction of firms in a concentrated market [that] recognizfe] their shared economic interests and their interdependence "with respect to price and output deeisions[,] is not in itself unlawful.” Id. at 553-54, 127 S.Ct. 1955 (first and second alterations in original) (internal quotation marks omitted). In the end, there is a simple question before us: Have the plaintiffs plausibly pled a live, ongoing conspiracy among these competitors? The answer to this question is likewise simple: No.
III.,
Today’s opinion runs counter to the purposes that underlie the imposition of a limitations period in private antitrust actions. The first purpose is to limit the public harm incurred by the conspiracy. See Z Techs. Corp. v. Lubrizol Corp., 753 F.3d 594, 603 (6th Cir. 2014) (“By encouraging parties to bring suits earlier, the statute of limitations attempts to minimize the public harm that might arise from harmful monopolies.... ”). Permitting parties like the plaintiffs to bring antitrust suits reflects a “congressional objective of encouraging civil litigation to supplement Government efforts to deter and penalize the ... prohibited practices.” Rotella v. Wood. 528 U.S. 549, 557, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000) (“The object ... is thus not merely to compensate victims but turn them into prosecutors, ‘private attorneys general’ .... ”). Because “private suits under the antitrust laws are allowed to correct public wrongs, it is appropriate to encourage suits as soon as possible to stop (or at least compensate) harm to the public.” Midwestern Mach., 392 F.3d at 272. Congress did not intend for plaintiffs to sit back, with full knowledge of the 2008 conspiracy, and wait six years before finally correcting a public harm.[6] See Rotella, 528 U.S. at 559, 120 S.Ct. 1075 (describing the antitrust enforcement scheme as “aimed at rewarding the swift who undertake litigation in the public good”).
Beyond a concern for limiting public harm, a limitations period also provides repose to defendants and avoids the unnecessary defense of stale claims. The antitrust limitations period provides finality and certainty to business transactions. 2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 320a, at 325 (4th ed. 2014). It saves defendants from the specter of perpetual litigation. And the need for timely prosecution of claims is especially great in antitrust law. “Antitrust liability depends not only on the parties’ acts but also on many surrounding circumstances, including the behavior of rival firms and general market conditions—matters that may be hard to reconstruct long after-wards.” Id. at 326. Allowing suits to be brought many years after the antitrust violation occurred may well deprive defendants the opportunity to present a proper defense.
IV.
In today’s opinion, the majority has morphed Klehr into a sledgehammer and then reared that hammer to shatter the antitrust statute of limitations. I do not believe that was the Supreme Court’s intent in Klehr, nor do I believe the law permits such a result. I respectfully dissent.

. Judge Posner has described dicta as "any statement made by a court for use in argument, illustration, analogy or suggestion. It is a remark, an aside, concerning some rule of law or legal proposition that is not necessarily essential to the decision and lacks the authority of adjudication.” United States v. Crawley, 837 F.2d 291, 292 (7th Cir. 1988) (internal quotation marks omitted). Because I believe the discussion of antitrust in Klehr falls under the category of dicta, I do not believe it deserves the lofty position of authority afforded to it by the majority’s opinion. But I will proceed in my analysis as if the language is binding authority on us.

. There is but one possible exception: paragraph 13, which alleges that “during calls and meetings with AmeriGas executives occurring at least as late as 2Q10, Janish repeatedly dismissed concerns that Blue Rhino might undercut AmeriGas on price or fill levels with words to the effect of, T talked to Blue Rhino, and that’s not going to happen.’ ” But even this allegation falls short of the Twombly standard. The complaint does not allege whether the conversations between AmeriGas and Blue Rhino occurred during the limitations period, only that comments from those alleged conversations were purportedly shared in a later retelling of the conversations. And the retelling can only report on "words to the effect of whatever was said. The dates of the conversations are left to the widest range of time, though curiously late enough to just reach into the limitations period. To be sure, the complaint names one individual employed by AmeriGas. But naked assertions of misconduct, combined with a name discovered from a company directory, are not enough to survive a motion to dismiss under Twombly and Iqbal.

. In fact, the FTC, whose 2014 lawsuit precipitated this case, disagrees with the plaintiffs’ allegations. "The Commission’s Complaint does not allege that [the defendants’] initial decisions to reduce fill levels to 15 pounds were the result of an agreement.” In re Ferrellgas Partners, L.P., FTC Docket No. 9360, 2014 WL 5787605, at *6 (Oct. 31, 2014) (emphasis added).

. The majority opinion offers this small comfort to defendants: a plaintiff cannot recover for injuries suffered outside the four-year limitations period. But I see nothing in this opinion preventing a new lawsuit against the defendants four (or 40) years from now so long as fill levels remain at 15 pounds, even if price fluctuates. Small comfort indeed.