**Laffit PINCAY, Jr.; Christopher J. McCarron, Plaintiffs–Appellees–Cross–Appellants,**

v.

**Vincent S. ANDREWS; Robert L. Andrews; Vincent Andrews Management Corp., Defendants–Appellants–Cross–Appellees.**

Nos. 98–55217, 98–55288, 98–55449.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 2, 2000

Filed Feb. 6, 2001

David Boies, Boies, Schiller & Flexner, Armonk, New York, NY, for defendants-appellants/cross-appellees.

Neil Papiano, Iverson, Yoakum, Papiano & Hatch, Los Angeles, California, for plaintiffs-appellees/cross-appellants.

Before: O'SCANNLAIN, FERNANDEZ, and RAWLINSON, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must decide whether the civil Racketeer Influenced and Corrupt Organizations Act ("RICO") statute of limitations begins to run, as a matter of law, upon receipt of written disclosure of the alleged injury.

## I

Lafitt Pincay and Christopher McCarron are professional horse racing jockeys who have been inducted into the sport's Hall of Fame. Vincent Andrews ("Vincent"), Robert Andrews ("Robert"), and their company, Vincent Andrews Management Corporation ("VAMC") (collectively "Andrews"), are investment advisors whom both Pincay and McCarron retained between 1969 and 1988.

Pincay began investing the earnings from his racehorse riding in 1967, when he orally employed Vincent's father, also named Vincent Andrews, to manage his financial affairs for a flat fee of 5% of his annual income. Pincay orally continued this arrangement in 1969, including the 5% flat fee, when Vincent took over his father's business and formed VAMC. In 1972, Vincent's brother, Robert, joined VAMC. Pincay's arrangement with VAMC called for the firm to handle Pincay's financial, accounting, and tax matters. McCarron orally entered into the same arrangement with VAMC, including the 5% flat fee, beginning in 1979. Pincay terminated his arrangement with VAMC in 1987 and McCarron did so in 1988.

Throughout their arrangements with VAMC, the firm recommended to Pincay and McCarron dozens of investment opportunities, and they partook in many of these. Many were ventures in which Robert, Vincent, or VAMC held a stake. For example, in some ventures the Andrews held a partnership interest, and in others they would be paid compensation based on the amount of capital invested in the venture. Many of these came with written disclosure of the Andrews' financial interest. For example, a document associated with one venture, dated 1972 and signed by Pincay, binds Pincay to pay "Andrews & Co." 10% of the capital distribution of the venture. Another, dated 1984 and signed by McCarron, lists Andrews & Co., a "corporation controlled by Robert Andrews," as the managing partner of the venture. A similar document, dated 1984

and signed by Pincay, explains that the managing partner, listed as Andrews & Co. "controlled by Robert Andrews," will receive a management fee equal to a fraction of the amount invested in the venture. Perhaps the most explicit is a document, dated 1980 and signed each by Pincay and McCarron, which notes that Robert "will receive compensation from the [venture] ... in the amount of five percent (5%) of the capital contributions to be paid by such investors."

In 1989, after they had terminated their arrangements, Pincay and McCarron sued the Andrews in the Federal District Court for the Central District of California. They alleged various state law claims, including breach of contract and breach of fiduciary duties, as well as mail and wire fraud violations of RICO. Their theory of RICO liability argued that the Andrews had committed mail and wire fraud by taking, in violation of their oral agreements, more than 5% of their annual income, in the form of the payments the Andrews additionally received from the ventures in which they invested. The jury returned verdicts on both the state and RICO claims against Vincent, Robert, and VAMC. The jury found that Pincay would not have invested in 29 ventures, and McCarron would not have invested in 13 ventures, but for the Andrews' unlawful conduct. The jury awarded Pincay $670,685 and McCarron $313,000 in compensatory damages for their state and RICO claims. Pincay also received $2.25 million, and McCarron roughly $1.3 million, in punitive damages for the state law violations. The district court awarded Pincay $603,967 and McCarron $255,986 in attorneys fees under RICO. At the court's behest, Pincay and McCarron elect- ed to treble their compensatory damages under RICO in lieu of the compensatory and punitive damages available under state law.

The Andrews filed a renewed motion for judgment as a matter of law and a motion for a new trial, in which they argued that the statute of limitations had run and that there was insufficient evidence both to support a RICO claim and to support the amount of damages awarded. The district court denied these motions. The Andrews filed a timely notice of appeal and argue that their motions were improperly denied. Pincay and McCarron filed a timely notice of cross-appeal and argue that they should not have been forced to elect either RICO treble damages or state law punitive damages. The appeals were consolidated before this court.

## II

We first address the Andrews' argument that the statute of limitations had run prior to the time Pincay and McCarron filed their suits in 1989.[1] The jury concluded that the statute of limitations had not run.

The statute of limitations for civil RICO actions is four years.[2] *See Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). Pincay entered into the agreement for investment management services with VAMC in 1969 and McCarron did so in 1979. Pincay and McCarron invested in ventures from which the Andrews stood to make a profit throughout the 1970s and 1980s. Yet, Pincay and McCarron did not file their suits until 1989.

---

1. The Andrews argued that, as a threshold matter, Pincay and McCarron's RICO claims were precluded by retroactive application of a provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67, § 107, 109 Stat. 737, 1758 (1995). We recently concluded, however, that this provision cannot be applied retroactively. *See Scott v. Boos*, 215 F.3d 940, 942–49 (9th Cir.2000).

2. For some reason, the jury was instructed that the statute of limitations was three years, rather than four years. This error does not matter for this appeal, however, because the jury's conclusion that a three-year statute of limitations did not run means that *a fortiori* it would have concluded that the four-year statute of limitations had not run.

■ We have continuously followed the "injury discovery" statute of limitations rule for civil RICO claims. *See Grimmett v. Brown*, 75 F.3d 506, 511 (9th Cir.1996).[3] Under this rule, "the civil RICO limitations period begins to run when a plaintiff knows or should know of the injury that underlies his cause of action." *Id.* at 510 (internal quotation marks omitted). Thus, the "injury discovery" rule creates a disjunctive two-prong test of actual or constructive notice, under which the statute begins running under either prong.

■ The plaintiffs argue, and the district court held, that in cases, such as this one, where the injurer and the injured were in a fiduciary relationship with one another, constructive notice does not begin to run the statute of limitations. There is no support for this contention in our cases. In *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406 (9th Cir.1987), we affirmed summary judgment against RICO plaintiffs on the ground of constructive notice even though the defendants owed the plaintiffs a fiduciary duty. The defendant responsible for sending the plaintiffs written disclosure of their injury in that case was the general partner of the ventures in which the plaintiffs were limited partners, *see id.* at 1409. Under the mid–1970's Montana law applicable in *Volk* (as with the laws of most states), these partners owed one another certain fiduciary duties. *See* Mont.Code Ann. §§ 35–10–401, 402–405 (1991); *Arnold v. Cremer*, 163 Mont. 174, 515 P.2d 957, 960 (1973) (recognizing "rules of law" that partners owe each other fiduciary duties).

The only case cited by Pincay and McCarron here and by the District Court in its opinion and order to support the view that constructive notice does not commence the statute of limitations is a non-RICO decision, *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499 (9th Cir. 1988). The relied upon language from *Conmar* reads: "Passive concealment of information is not enough to toll the statute of limitations, unless the defendant had a fiduciary duty to disclose information to the plaintiff." *Id.* at 505 (internal citations omitted). This language, however, is inapposite to the case at hand because the distinction made in *Conmar* between fiduciary relationships and non-fiduciary relationships was with regard to the doctrine of fraudulent concealment, not the doctrine of constructive notice. Although fraudulent concealment may *toll* the statute of limitations, a question we confront below, that does not settle the question of when the statute of limitations *began to run*. The two questions are analytically distinct. *See Beneficial Standard Life Ins. Co. v. Madariaga*, 851 F.2d 271, 276 (9th Cir. 1988).

■ We reaffirm the holding in *Volk* that constructive notice begins to run the statute of limitations regardless of any fiduciary relationship between the injured and the injurer. Thus, if no reasonable jury could find that Pincay and McCarron did not have constructive notice of their injuries before 1985, the Andrews are entitled to judgment as a matter of law.[4]

---

3. Although the Supreme Court has overruled other statute of limitations standards for civil RICO, *see Rotella v. Wood*, 528 U.S. 549, 120 S.Ct. 1075, 1080, 145 L.Ed.2d 1047 (2000) (overruling the "injury and pattern discovery rule" of the Sixth, Eighth, Tenth, and Eleventh Circuits); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 187, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997) (overruling the Third Circuit's "last predicate act" rule), it has left our "injury discovery" rule intact. It is important to note, however, that the Supreme Court has explicitly reserved the question of whether our standard is correct. *See Rotella*, 120 S.Ct. at 1080 n. 2.

4. Pincay and McCarron note that, even if constructive notice could begin to run the statute of limitations in this case, the jury was instructed otherwise and the Andrews failed to object to the instruction. This, however, does not prevent us from reversing the district court's denial of judgment as a matter of law to the Andrews on this ground because, when reviewing a motion for judgment as a matter of law, we apply the law as it should be, rather than the law as it was read to the jury. *See Air–Sea Forwarders, Inc., v. Air Asia Co., Ltd.*, 880 F.2d 176, 181–83 (9th Cir.1989).

 The injury alleged by Pincay and McCarron was the act of paying more than 5% of their yearly income to the Andrews. "The plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the fraud." *Beneficial Standard Life Ins. Co.*, 851 F.2d at 275. It is hard to imagine what would constitute "enough information to warrant an investigation" if receiving a written disclosure of one's purported injury does not. As just one example of the many instances in which Pincay and McCarron received written disclosure of their injury, Pincay and McCarron both signed a document in 1980 disclosing that Robert "will receive compensation from the [venture] ... in the amount of five percent (5%) of the capital contributions to be paid by such investors." Clearly, as of 1980, both Pincay and McCarron had "enough information to warrant an investigation" into whether the ventures in which they were investing would result in more than 5% of their annual income finding its way into the wallets of the Andrews. Indeed, in *Volk,* we held, as a matter of law, that receiving written disclosure of the possibility of injury was sufficient to put a civil RICO plaintiff on constructive notice of his injury. *See Volk,* 816 F.2d at 1412, 1414–15 (affirming summary judgment for defendants on statute of limitations grounds because the plaintiffs were placed on inquiry notice upon "their receipt of the 1978 annual report and the general partner's September 1979 letter"). We follow *Volk* and hold that, as a matter of law, Pincay and McCarron received constructive notice of their injuries at least as early as 1980. Thus, unless the statute of limitations was tolled, Pincay and McCarron's civil RICO claims are time-barred as a matter of law and the Andrews are entitled to judgment as a matter of law.

### III

 Pincay and McCarron claim that even if the statute of limitations began to run prior to 1985, the statute was tolled until 1988 because the Andrews "fraudulently concealed" information that prevented them from learning of the fraud. "Equitable tolling doctrines, including fraudulent concealment, apply in civil RICO cases." *Grimmett,* 75 F.3d at 514. "The doctrine is properly invoked only if a plaintiff establishes affirmative conduct upon the part of the defendant which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief." *Volk,* 816 F.2d at 1415 (internal quotation marks omitted).

 Pincay and McCarron cannot prevail on their fraudulent concealment claim in this case because there is a long line of our cases holding that, in order to prevail on such a claim, plaintiffs "must demonstrate that they had *neither actual nor constructive notice* of the facts constituting their claims for relief." *Volk,* 816 F.2d at 1415 (emphasis added); *accord Grimmett,* 75 F.3d at 514–515 (citing cases). As we decided above, Pincay and McCarron had constructive notice of their injuries prior to 1985 as a matter of law. Thus, they cannot prevail on their fraudulent concealment claim.

### IV

Because we conclude that the statute of limitations had run as a matter of law prior to 1989, we need not reach the remaining issues raised by the Andrews regarding the sufficiency of the evidence. Moreover, given that we conclude that their RICO claims were untimely, Pincay and McCarron's cross-appeal raising the issue of election of damages is moot. Finally, our holding is limited to the civil RICO claims at issue on appeal and does not disturb the jury's verdict with regard to Pincay and McCarron's state law claims. Judgment for Pincay and McCarron is

REVERSED.